

Justin Lonergan
601 West Riverside Ave, Suite 900
Spokane, Washington 99201
509.624.7606
Attorney for Billy Gene Pinson

# United States District Court
## Eastern District of Washington
Honorable Stanley A. Bastian

| | |
|---|---|
| United States of America, | No: 2:22-cr-0120-SAB-1 |
| Plaintiff, | Defendant's Sentencing Memorandum |
| v. | |
| Billy Gene Pinson, | |
| Defendant. | |

Mr. Pinson respectfully proposes that a sentence of 25 years' incarceration followed by lifetime supervision is sufficient, but not greater than necessary, to provide just punishment, protect the public, and afford him a reasonable rehabilitation opportunity once he is released from prison late in life.

## I.     Missed Signs of Mr. Pinson's Struggles

Mr. Pinson comes before the Court on charges that, while egregious, cannot be separated from his very challenging set of personal characteristics.  During his childhood in the 1990s, Mr. Pinson's family learned that he was developmentally challenged.  ECF No. 81, *Draft PSR*, para. 235.  However, Billy's family lacked a clear understanding of his developmental limitations (unsurprising given advancement in educational support over the past two decades).  As a result, Billy lacked the resources to truly keep up with or make up the gap with his peers.  It also appears that Billy, as a young boy (around age 7) experienced a sexual assault that his family likely never knew about.  *See id.* at para. 231; *see also* Exhibit B, *2019 Psychological Report*, pg. 2 ("Mr. Pinson reported being sexually molested as a youth;" no therapy or treatment is noted).  In hindsight, we can appreciate that Billy's early struggles were a missed opportunity to try setting a better course.

The full impact of Mr. Pinson's struggles continued to emerge as he passed through the social services system as a young adult.  Documents provided by the

defense to U.S. Probation as part of the pre-sentencing process reveal that in 2006, Mr. Pinson's diagnoses were confirmed, and the issues were more than ADHD. At that point, we learned that Billy had a diagnosis of "mild mental retardation,"[1] "low average memory functioning," and extremely low Full Scale IQ scores. *See* ECF No. 81, paras. 248-261 (Mr. Pinson's "IQ scores were borderline for verbal and extremely low for performance and full scale"). The assessing psychologist concluded that Billy, now 26 years old, would have "great difficulty keeping up with his peers in a wide range of situations that required age-appropriate thinking and reasoning abilities." *See id.* at para. 250.

Importantly, Mr. Pinson's 2006 psychological assessment sheds light onto Mr. Pinson's involvement with the criminal justice system. In 1995, Mr. Pinson had received a Special Sex Offender Disposition Agreement (SSODA), basically an alternative to imprisonment. *Id.*, para. 200. The Federal Defenders requested all records relating to the SSODA. To date, there has been nothing produced that suggests Mr. Pinson had sex offender treatment. There is also nothing showing that the court system, in its defense, knew of the likely contributing factors of low IQ and

---

[1] The undersigned notes that the word choice of "mental retardation" has appropriately fallen out of favor. Given this was the clinical diagnosis at the time, counsel relays it verbatim for accuracy and with no intent to disparage.

Defendant's Sentencing Memorandum
– 2 –

mental retardation.  As far as counsel can tell, Mr. Pinson was essentially put on limited supervised probation.  Although this likely seemed a reasonably optimistic approach at the time, it was actually probably a missed chance for intervention.

As the United States may appropriately point out, Mr. Pinson's current sex offenses occurred as an adult.  No dispute there.  It is impossible, though, to separate who a person is at the time of their offense from their formative experiences or lack of opportunities.  For someone whose record shows very little therapeutic intervention, Mr. Pinson's history and characteristics are therefore highly relevant to sentencing.  *See also* ECF No. 81, para. 272 (2019 psychological examination also found, *inter alia*, that "Mr. Pinson revealed a diffuse pattern of cognitive difficulties including memory problems, difficulties concentrating, intellectual limitations, and confusion").

## II.    Not Foreclosing the Future

One risk of sentencing in cases with lengthy sentence ranges is the possibility of unnecessarily tying our hands such that we cannot take advantage of future developments in the law.  The defense concern is that a 35-year sentence will become the dead hand that prevents future practitioners from using the state of the art, as it may develop while Mr. Pinson is in custody, to reasonably assure community safety.

We cannot know *today* all the sex offender supervision resources that will be available in the future.  Presumably, best management practices will continue to follow the current arc of rigorous and effective community supervision.  For example, there is no question that we are supervising sex offenders today better than we were in 2010 by virtue of enhanced technology.  It may very well be that in, say, 15 years, we have improved data, methodologies, tools, and treatments that exponentially reduce recidivism risk.

Yet, if the Court adopts the high range of the plea agreement, there will likely be no conceivable relief for Mr. Pinson.  For example, he is categorically ineligible for First Step Act early release.  Instead, the better approach is to favor the low end of the plea agreement not because it is lenient, but rather because we can reasonably expect improvements in sex offender management that support community safety.

One of the clearest examples of this is the Sentencing Commission's 2025 amendments that moved away from lifetime supervision for sex offenders.  *See* 2025 Amendments to U.S.S.G. §5D1.2(b).  This policy shift reflects Congress's goal that sentencing policy should "reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process."  See 28 U.S.C. §991(b)(1)(C), *United States Sentencing Commission*.

### III.  Mr. Pinson's Risk Will Decrease

Objectively, Mr. Pinson's risk will be significantly lower in the future.  The nature and circumstances of the case occurred while Mr. Pinson was raising and had access to children.  That *will not* occur as a federal supervisee, given both his age and Probation's authority to control his associations.  *See* ECF No. 81, *Suggested Special Conditions 1-4.*  Further, Mr. Pinson's health is likely to continue to deteriorate, reducing physical means for recidivism.  He appears before the Court with infirmities that will degenerate over the term of a 25-year sentence.  *See id.*, para. 243 (degenerative disk disease) and para. 246 (family history of heart disease).

Even assuming BoP properly credits Mr. Pinson for his substantial pretrial time, he will not be released until he approaches his 61st birthday.  BoP population data confirms that elderly inmates are a fraction of the overall prison population:

| Chart Label | Age Range | # of Inmates | % of Inmates |
|---|---|---|---|
| <18 | Under 18 | 16 | 0.0% |
| 18 | Ages 18-21 | 1,325 | 0.9% |
| 22 | Ages 22-25 | 6,688 | 4.4% |
| 26 | Ages 26-30 | 16,215 | 10.6% |
| 31 | Ages 31-35 | 24,857 | 16.3% |
| 36 | Ages 36-40 | 26,925 | 17.6% |
| 41 | Ages 41-45 | 25,530 | 16.7% |
| 46 | Ages 46-50 | 19,745 | 12.9% |
| 51 | Ages 51-55 | 13,119 | 8.6% |
| 56 | Ages 56-60 | 8,295 | 5.4% |
| 61 | Ages 61-65 | 5,407 | 3.5% |
| >65 | Over 65 | 4,714 | 3.1% |

Defendant's Sentencing Memorandum

– 5 –

Those numbers reflect a practical reality. At that stage of life, most individuals with a criminal record – even a serious one – can and should be managed in the community. Even appreciating the seriousness of the charges, Mr. Pinson's record is no different when it comes to his amenability to supervision. In short, protecting the public is sufficiently accomplished through a 25-year sentence, as that still sees Mr. Pinson regaining freedom only at the twilight of his life.

### IV. CONCLUSION

With his pleas, Mr. Pinson hopes this is a step toward closure for everyone in this case. He approaches sentencing with accountability, appreciating the egregiousness of the charges and conduct. He nonetheless maintains a positive attitude. He appreciates that a long sentence is not only punishment, but also a chance for him to seek out treatment and maybe even find work in custody. He sees the case as a chance to change the trajectory of his life. He asks only that the Court not foreclose him reentering society under strict conditions that he will need to follow for the rest of his life. As such, a 25-year prison sentence is sufficient.

Dated:   March 4, 2026

//

//

Respectfully Submitted,

*s/Justin Lonergan*
Justin P. Lonergan, ISB No. 11161
601 West Riverside Ave, Suite 900
Spokane, Washington 99201
t: (509) 624-7606
justin_lonergan@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following: Ann Wick, Assistant United States Attorney.

*s/Justin Lonergan*
Justin P. Lonergan, ISB No. 11161
601 West Riverside Ave, Suite 900
Spokane, Washington 99201
t: (509) 624-7606
f: (509) 747-3539
justin_lonergan@fd.org